IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No.   05-cv-01126-WDM-BNB

FREE SPEECH COALITION, et al.,

      Plaintiffs,

v.

ALBERTO GONZALES,

      Defendant.
_____

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
_____

Miller, J.

      This matter is before me on the plaintiffs' motion for a preliminary injunction.  I

have considered the parties' tendered evidence and written and oral arguments and

find that the motion should be granted in part.

<u>Background</u>

      Plaintiffs Free Speech Coalition, Inc. (FSC),[1] Free Speech Coalition of Colorado

(FSCC), David Conners (Conners), and Lenjo, Inc., d/b/a/ New Beginnings, Inc. (New

Beginnings) (altogether "Plaintiffs") seek to enjoin enforcement of 18 U.S.C. § 2257 and

the associated regulations against them.  Plaintiffs are all involved, in various

capacities, in the adult entertainment industry.  Plaintiffs seek a preliminary injunction

to protect themselves from any enforcement action pending this litigation.

_____

      [1]FSC is a California trade association which represents more than six hundred
businesses and individuals involved in the production, distribution, sale, and
presentation of non-obscene, adult-oriented materials.  Its mission is to protect the First
Amendment rights of its members.  Compl., ¶ 9.

"Concerned about the exploitation of children by pornographers, Congress enacted the Child Protection and Obscenity Enforcement Act of 1988. . . to require producers of sexually explicit matter to maintain certain records concerning the performers that might help law enforcement agencies monitor the industry." *Sundance Assoc., Inc. v. Reno* (*Sundance*), 139 F.3d 804, 805 (10th Cir. 1998). The relevant provisions of the Act were codified in part at 18 U.S.C. § 2257, and established criminal and civil liability for failures to create or maintain certain records by persons "produc[ing]" matters containing "actual sexually explicit conduct." 18 U.S.C. § 2257(a). In particular, § 2257(b) requires such "producers" to ascertain a performer's name and date of birth through "examination of an identification document . . . and any other indicia of . . . identity as may be prescribed by regulations," as well as any other name used by that performer and to record that information in the records required by § 2257(a). However, the statutory definition of "produces" excludes persons involved in "mere distribution or any other activity which does not involve hiring, contracting for managing, or otherwise arranging for the participation of the performers depicted." 18 U.S.C. § 2257(h)(3).

In 2003, Congress amended § 2257 by passing the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act, which stiffened the applicable penalties and expanded the definition of the term "produces" to include creation of a "computer generated image, digital image, or picture." Pub. L. No. 108-21, § 511, 18 U.S.C. § 2257(h)(3), (i).

§ 2257 also requires the Attorney General to "issue appropriate regulations to

2

carry out this section." 18 U.S.C. § 2257(g).  The Attorney General first promulgated

regulations on April 24, 1992, requiring, among other things,

> producers to retain copies of the performers' identification documents, to
> cross-index the records by all name(s) of each performer, including any
> alias, maiden name, nickname, stage name or professional name of the
> performer; and according to the title, number, or other similar identifier of
> each book, magazine, periodical, film, videotape, or other matter, and to
> maintain the records for a specified period of time.

Inspection of Records Relating to Depiction of Sexually Explicit Performances, 70 Fed.

Reg. 29607, 29608 (May 24, 2005).  Additionally, the regulations defined two types of

"producer:" (1) the "primary producer," who "actually films, videotapes, or photographs

a visual depiction of actual sexually explicit conduct;" and (2) the "secondary producer,"

who "produces, assembles, manufactures, publishes, duplicates, reproduces, or

reissues a book, magazine, periodical, film, videotape, or other matter intended for

commercial distribution that contains a visual depiction of actual sexually explicit

conduct." *Sundance*, 139 F.3d at 806 (*quoting* 28 C.F.R. § 75.2(a)).  In 1998, the Tenth

Circuit held that the regulations were invalid as *ultra vires* to the extent they regulated

those whose activity "does not involve hiring, contracting for[,] managing, or otherwise

arranging for the participation of the performers depicted." *Id.* (*quoting* 18 U.S.C.

§ 2257(h)(3)).

Effective on June 23, 2005, the Attorney General amended the regulations "to

account for changes in technology, particularly the Internet, and to implement the

[PROTECT] Act."  Inspection of Records Relating to Depiction of Sexually Explicit

Performances, 70 Fed. Reg. at 29608.  The updated regulations left in place those

portions declared invalid by the *Sundance* court.

The amended regulations, *inter alia*, (1) expanded the "secondary producer" definition to include any person "who inserts on a computer site or service a digital image of, or otherwise manages the sexually explicit content of a computer site or service that contains a visual depiction of an actual human being engaged in actual sexually explicit conduct, including any person who enters into a contract, agreement, or conspiracy to do any of the foregoing;" (2) expanded the record-keeping obligations of producers by requiring them to keep (a) a copy of all visual depictions produced; and (b) "[w]here the depiction is published on an Internet computer site or service, a copy of any URL associated with the depiction or, if no URL is associated with the depiction, another uniquely identifying reference associated with the location of the depiction on the Internet;" (3) continued various record maintenance and cross-referencing requirements; (4) required that the street address at which the records are kept be included in the compliance statement, required to be displayed on media containing the depictions; (5) required that producers keep a copy of a performer's identification card for depictions made after July 3, 1995; and (6) required that producers make their records available for inspections, including by making their records available for at least twenty hours per week.

Plaintiffs argue that the statute and regulations are invalid as violative of their First Amendment and privacy rights, and in any case, the regulations, to the extent they apply to secondary producers, contravene the Tenth Circuit's holding in *Sundance*.

<u>Standard of Review</u>

4

Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1256 (10th Cir.2003).  *See also SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).  The decision to grant injunctive relief is a matter of discretion. *Id.*

In order to obtain preliminary injunctive relief, the moving party must establish: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Valley Cmty. Pres. Com'n v. Mineta*, 373 F.3d 1078, 1083 (10th Cir. 2004).  Additionally, if the movant can establish that the latter three requirements "tip strongly in his favor . . . the [movant] may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Flowers*, 321 F.3d at 1256 (*quoting Davis v Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

As reiterated in *O Centro Espirta Beneficiente Uniao Do Vegetal v. Ashcroft*, the Tenth Circuit views as disfavored motions for the following types of preliminary injunctions: those that  (1) disturb the status quo; (2) are mandatory as opposed to prohibitory; and (3) afford the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.  389 F.3d 973, 975 (10th Cir. 2004).  *See also SCFC ILC, Inc.*, 936 F.2d at 1098-99.  A request for a "disfavored" injunction "should be even more closely scrutinized [than a motion for a typical preliminary injunction] to

assure that the exigencies of the case support the granting of . . . [such an extraordinary] remedy," and the movant may not rely on the modified-likelihood-of-success-on-the-merits standard.  *O Centro*, 389 F.3d at 975.

Discussion

The first issue is whether Plaintiffs are seeking a disfavored injunction, and whether they may rely on the Tenth Circuit's modified likelihood of success on the merits standard.  Defendant argues that, "because plaintiffs seek to enjoin a statute whose basic requirements have been in effect for more than a decade, as well as many aspects of the regulations that have been in effect for a similar period, they are seeking to upset rather than preserve the status quo." (Def.'s Opp., at 9.)  Plaintiffs, on the other hand, note that the government has never initiated any inspections or prosecutions under  § 2257, and therefore argue that the status quo is an absence of enforcement.

First, as Defendant points out, the Tenth Circuit does not apply the "less rigorous fair-grounds-for-litigation standard" where "a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme."  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation omitted) (reviewing preliminary injunction against nude dancing ordinance).  Consequently, regardless of whether they are seeking disfavored relief, Plaintiffs must establish a substantial likelihood of success on the merits.

With regards to the status quo issue, I agree with Defendant's characterization: the correct framing of the issue is not whether the government was utilizing the statute

6

and regulations, but whether it was permitted to do so.  However, this applies only to the regulations existing prior to the amendment; to the extent Plaintiffs seek to enjoin enforcement of new obligations under the June 23, 2005 regulations, they are not seeking a disfavored injunction.

1.      Success on the Merits

        Plaintiffs raise three general arguments: (1) the new regulations are *ultra vires* under the rationale of *Sundance*, because they define the term "secondary producer" to include activities explicitly excluded by § 2257; (2) the statute and regulations violate their rights under the First Amendment by chilling, if not effectively banning, their dissemination of constitutionally protected expression; and (3) the same violate their rights to privacy.

        A.      *Ultra Vires*

        § 2257 generally requires that any person who "produces any book, magazine, periodical, film, videotape, or other matter" containing actual sexually explicit conduct "create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction."  The statue defines the term "produces" as meaning:

> to produce, manufacture, or publish any book, magazine, periodical, film, video tape, computer generated image, digital image, or picture, or other similar matter and includes the duplication, reproduction, or reissuing of any such matter, but <u>does not include </u>mere distribution or any other activity which does not involve hiring, contracting for managing, or otherwise arranging for the participation of the performers depicted

18 U.S.C. § 2257(h)(3) (emphasis added).

7

As noted above, Defendant's regulations interpret the statute as applying to two types of "producers" to whom the statute and regulations apply: (1) primary producers, identified as including any person who "actually films, videotapes, photographs, or creates a digitally- or computer-manipulated image, a digital image, or picture of, or digitizes an image of, a visual depiction of an actual human being engaged in actual sexually explicit conduct," 28 C.F.R. § 75.1(c)(1); and (2) secondary producers, identified as including:

> any person who produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues a book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, picture, or other matter intended for commercial distribution that contains a visual depiction of an actual human being engaged in actual sexually explicit conduct, or who inserts on a computer site or service a digital image of, or otherwise manages the sexually explicit content of a computer site or service that contains a visual depiction of an actual human being engaged in actual sexually explicit conduct, including any person who enters into a contract, agreement, or conspiracy to do any of the foregoing.

28 C.F.R. § 75.1(c)(2).  The regulation excludes persons whose activities are limited to (1) certain photo or film processing activities, (2) mere distribution, (3) "any activity, other than those activities identified in paragraphs (c)(1) and (2) of this section, that does not involve the hiring, contracting for, managing, or otherwise arranging for the participation of the depicted performers," (iv) providing web-hosting services where control of content is impracticable; and (v) providing electronic communications services.  28 C.F.R. § 75.1(c)(4) (emphasis added).

In *Sundance Associates v. Reno*, the Tenth Circuit held that the prior regulations' defining of "producer" to apply to both primary and secondary producers

8

was invalid because it "clashe[d] impermissibly" with the statutory definition of

"produces."  139 F.3d at 806.[2]  The court noted that under *Chevron USA v. NRDC*, 467

U.S. 837, 842 (1984), the first question was whether "Congress has directly spoken to

the precise question at issue," and that if the statute is clear and unambiguous, the

court should interpret the statute according to its plain language and afford the agency

interpretation no deference.  *Id.* at 807 (*quoting K Mart Corp. v. Cartier, Inc.*, 486 U.S.

281, 291 (1988)).

The court found that § 2257's language was clear and unambiguous.   It

excluded from the regulation "those who basically have had no contact with the

performers (mere distributors and others not involved in the 'hiring, contacting for[,]

managing, or otherwise arranging for the participation of the performers depicted')."  *Id.*

at 808.  The Court concluded that the Attorney General's regulations improperly failed

to "exclude persons from the class that the statue requires."  *Id.*  The court rejected the

Attorney General's argument that the regulations' comprehensive regulatory scheme

was necessary to adequately enforce the record keeping requirements, noting that

although the Attorney General may have identified a problem with the statute, "neither

the court nor the Attorney General has the authority to rewrite a poor piece of

legislation. . . . That responsibility lies solely with Congress."  *Id.* at 810.  Consequently,

the court ordered the clause "other than those activities identified in paragraphs (c)(1)

and (2) of this section" be stricken from the regulation.

---

[2]Defendant does not dispute that the current regulations' provisions regarding
primary and secondary producers are indistinguishable from those at issue in
*Sundance.*

9

Plaintiffs argue that *Sundance* mandates that the current regulations, which maintain the same language found invalid by the *Sundance* court, are likewise invalid. In response, Defendant argues that he is asserting a new interpretation of § 2257, which is reasonable and therefore entitled to deference, and that Congress acquiesced in his belief that § 2257(h) applies to secondary producers because Congress amended the provision via the PROTECT Act, and failed to alter the definition despite knowledge of his interpretation. *See Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1438 (10th Cir. 1996).

None of Defendant's arguments change the reality that *Sundance* is binding upon me. The Tenth Circuit specifically held that § 2257(h) is unambiguous and that plain language of the statute excludes persons "who basically have had no contact with the performers." 139 F. 3d at 808. The amendment does not alter the relevant language, or somehow render the provision ambiguous.[3] Accordingly, even were I to agree that the statute is ambiguous, I am bound by principles of *stare decisis* to hold that the statue is unambiguous. Only the Tenth Circuit or the Supreme Court can change established Tenth Circuit precedent. *See United States v. Milto*, 714 F.2d 294, 298 (3d Cir. 1983).

Defendant's argument that Congress acquiesced in his interpretation of "producer" fails for the same reason. As the *Catron County* court noted, the congressional acquiescence theory is a species of legislative history analysis. 75 F.3d

---

[3]As noted, the PROTECT Act only amended the definition of "produce" to include "computer generated image, digital image, or picture." *See* Pub. L. 108-21, Section 511, at 685.

at 1438.  Here, where congressional intent may be determined from the plain language of the statute, interpretation is not necessary and  the doctrine plays no role.[4]  *See Brown v. Gardner*, 513 U.S. 115, 121 (1994) (*quoting Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991)) ("where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction").

Consequently, Plaintiffs have shown a substantial likelihood of success of establishing that the statute and regulations may not be enforced as to secondary producers who are not involved in any activity that involves "hiring, contracting for managing, or otherwise arranging for the participation of the performers depicted." § 2257(h)(3).

B.    First Amendment

Plaintiffs argue that § 2257 and the regulations unlawfully infringe upon rights protected under the First Amendment.  They first claim that the substantial record-keeping obligations make compliance impossible, and thus operate as a "prior restraint" by inducing self-censorship chilling protected speech.  However, it is clear that the statute and regulation do not constitute a "prior restraint" as traditionally described by the Supreme Court.  *See  Alexander v. United States*, 509 U.S. 544, 550

---

[4]Defendant also points to the adoption of the Protect Act subsequent to the decision of *Am. Lib. Assoc. v. Reno*, 33 F.3d 78 (D.C. Cir. 1994) upholding § 2257 and the 1992 regulations and argues that the reenactment of the applicable provisions indicates Congress' agreement with the *Reno* interpretation.  *See Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978).  Plaintiffs make the countervailing argument that the *Sundance* decision also antedated the Protect Act leading to the opposite conclusion. Given my "plain meaning" ruling, I need not resolve this potential conflict.

(1993) (*quoting* M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984)) ("The term prior restraint is used 'to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.'").  Regardless, whether the statute and regulations are framed as a de facto "prior restraint" or a de facto "ban," none of the cases Plaintiffs rely on provide me with any basis for analyzing the statute and regulations with the level of scrutiny required for a law that actually forbids expression.  For instance, Plaintiffs place great reliance on *Ashcroft v. Free Speech Coalition*, where the Court held that "government may not suppress lawful speech as the means to suppress unlawful speech."  However, *Ashcroft* dealt with an express ban on computer-created, or "virtual" images of child pornography, not regulations like those in this case, which although they may burden Plaintiffs' expression,[5] do not simply illegalize it.[6]

Furthermore, Plaintiffs do not provide convincing evidence that the impact of the statute and regulations effectively ban sexually explicit expression.  Rather, as

---

[5]The extent of the burden on Plaintiffs' expression is discussed infra.

[6]Similarly, Plaintiffs cite to *Simon & Schuster, Inc. v Members of New York Crime Victims Board*, 502 U.S. 105, 121-22 (1991) for the proposition that regulatory burdens on expression can be so severe as to constitute a de facto ban on expression.  The Court did not so hold.  Rather, in that case, the Court found the "Son of Sam" law–which required that an accused or convicted criminal's income from works describing his crimes be made available to victims and creditors–was unconstitutional under the First Amendment because the law was overinclusive, namely that it "reache[d] a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated," and which was therefore outside the state's compelling interest.  *Id.* at 122.

12

discussed below, most of the obligations imposed by the statute and regulations have been in place for over ten years, yet the output of the adult entertainment industry has grown, not dwindled.

Plaintiffs also argue that "section 2257 was deliberately designed to reverse [the] constitutional presumption" that sexually explicitly expression is generally protected by banning expression unless its proponents demonstrate that it is lawful.[7] (Pl.'s Suppl. Mem. at 4, *citing Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). *See also Ashcroft*, 535 U.S. at 255 (suggesting that "[t]he Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is not unlawful," but finding it unnecessary to determine if such an attempt was constitutional). However, even assuming there is such a presumption (which *Chaplinsky*, at least, does not establish), as discussed above, the statute and regulations do not  ban Plaintiffs' expression.

Next, Plaintiffs argue that § 2257 and the regulations are content-based restrictions which are overbroad and fail to adequately advance the government's asserted interest.  The parties first dispute whether I should apply strict or intermediate scrutiny to the statute and regulations.  Two courts of appeals have examined First

---

[7]Using the hypothetical that the records are lost or destroyed, Plaintiffs argue that the statute and regulations are unconstitutional because  communication of that lost or destroyed depiction becomes unlawful, even if there is no question that the performers involved were adults.  While this argument may raise  a constitutional issue in an as-applied context, the Supreme Court has held that a statute may not be invalidated on a facial challenge simply "because some persons' arguably protected conduct may or may not be caught or chilled by the statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 618 (1973).

Amendment challenges to § 2257 and the implementing regulations, and have concluded that because the statute and regulations are content neutral, intermediate scrutiny applies.  *Connection Dist. Co. v. Reno*, 154 F.3d 281, 291 (6th Cir. 1998); *Am Lib. Assoc. v. Reno*, 33 F.3d at 242-43.  Plaintiffs dispute that the statute and regulations are content-neutral, arguing that they "impose[] additional burdens on protected speech purely on the basis of the content of that speech."  (Pl.'s Prehrg Br., at 14.)  Nonetheless, I find that intermediate scrutiny should apply as I agree with the Sixth Circuit's finding that "[t]he government's goal of preventing child pornography through the record-keeping provisions of the Act clearly is not an attempt to regulate the speech of [Plaintiffs] because of disagreement with the messages they convey."  *See Connection Distrib. Co.*, 154 F.3d at 290.  *See also Heideman* 348 F.3d at 1195 (ordinance banning complete nudity at sexually oriented businesses is subject to no more than intermediate scrutiny "because the governmental purpose is based on the secondary effects of nudity in sexually oriented businesses rather than on disagreements with the content of the message").

Under intermediate scrutiny, "a government regulation is constitutional if the obligations it imposes are 'narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information'."  Connection Distrib. Co*., 154 F. 3d at 291 (*quoting Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  It does not appear to be disputed that the governmental interest put forward–preventing child pornography–is significant, if not compelling.  (*See* Pl.'s Supp. Mem., at 6.)

To be narrowly tailored, a regulation must "not burden substantially more speech than is necessary to further the government's legitimate interests." *Am. Lib. Assoc.*, 33 F.3d at 88 (*quoting Bd. of Trustees of State Univ. of New York v. Fox,* 462 U.S. 469, 478 (1989). *See also Connection Distrib. Co.*, 154 F.3d at 293 (*quoting Ward*, 491 U.S. at 799) (regulation is narrowly tailored "so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation").

Plaintiffs first argue that Defendant has failed to advance any concrete evidence to justify the statute and regulations, specifically arguing that there is no evidence that regulated producers such as themselves ever create material involving persons under the age of 18, or that the record keeping or labeling requirements impact child pornographers. *See City of Los Angeles v. Alameda Books*, 535 U.S.425, 449 (2002) (Kennedy, J., concurring) ("a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact"). They claim that the statute unduly burdens legitimate producers of adult pornography and regulates expression in a manner that a substantial portion of the burden does not serve to advance its goals. *See Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Plaintiffs do not convince me that the statute and regulations do not advance the government's interest in preventing child pornography. According to the D.C. Circuit, § 2257 advances the abatement of child pornography in fundamental ways:

> By requiring that primary producers inspect and make a record of
> documentary evidence of the performers' ages and, in turn, that
> secondary producers inspect and retain a copy of the same, section 2257

15

> forwards three goals: It ensures that primary producers actually confirm
> that a prospective performer is of age; it deters children from attempting
> to pass as adults; and, most important, it creates the only mechanism by
> which secondary producers (who by definition have no contact with
> performers) can be required to verify the ages of the individuals pictured
> in the materials they will be producing.[8]

*ALA*, 33 F.3d at 88-89.  *See also Connection Distrib. Co.*, 154 F.3d at 292 ("universal

requirement of age disclosure, regardless of the apparent age of an individual in a

visual depiction, is critical to the government's interest in ensuring that no minors are

depicted in actual sexual conduct").  It appears undisputed that there is a significant

market for pornography involving young-looking performers.   *See* Joint Exhibit 1 and

its attached exhibits.  Such a demand creates a risk of under-age participation which

can be prevented or discouraged by disclosure and reporting requirements.

Such a common sense conclusion is certainly within the realm of congressional

authority.  "In reviewing the constitutionality of a statute, courts must accord substantial

deference to the predictive judgments of Congress."  *Turner Broadcasting Sys., Inc. v.

F.C.C.*  520 U.S. 180, 195 (1997). *See also Florida Bar v. Went For It, Inc.,* 515 U.S.

618, 628 (1995) (noting that the Court has allowed the government "to justify

restrictions based solely on history, consensus, and simple common sense"); *Alameda

Books*, 535 U.S. at 438 ("a municipality may rely on any evidence that is "reasonably

believed to be relevant" for demonstrating a connection between speech and a

substantial, independent government interest").  In particular, although I accept that

---

[8]Of course, this latter means of forwarding the statute's goals–creating a
mechanism to require secondary producers to verify ages of performers–is invalid
under *Sunset* to the extent such producers had no contact with the performers.

16

Plaintiffs themselves would not knowingly engage in child pornography, it only makes sense, given extensive demand for pornography involving young-looking performers, to conclude that there is a substantial risk that performers under the age of 18 will be used in such materials.  This risk necessitates government regulatory efforts, including imposing on producers of pornography mandatory age-checking and record-keeping to provide a shield against child pornography.

Plaintiffs next argue that the burden imposed by the statute and regulations is severe and overbroad in scope.  Because I have already determined that Plaintiffs have established a substantial likelihood of success with regards to the statute's application to some secondary producers under *Sundance*, I will focus on the burden on producers who remain regulated.

As to obligations existing prior to the promulgation of the June 2005 regulations, Plaintiffs fail to overcome Defendant's suggestion that there has been no noticeable impact on the quantity of sexually explicitly speech from the enactment of § 2257 or promulgation of the earlier regulations.[9]  Rather, Defendant notes that plaintiff David Conners, who runs a "one man" production company, has produced 41 movies, plaintiff New Beginnings has sold at least 1 million sexually explicit films, and the number of United States-based websites containing sexually explicit speech has boomed to 500,000.[10]  Given the Plaintiffs' heightened burden under *O Centro*, their failure to

---

[9]Plaintiffs do note that the government has not conducted a single inspection in the 17 years since the statue was enacted.

[10]Although some of these examples may involve producers who cannot be regulated under *Sundance*, nonetheless, their output seems to reflect the general

respond with evidence demonstrating a negative impact on sexually explicit speech is fatal to their quest to preliminarily enjoin these pre-existing obligations.[11]

With regard to the new obligations, Plaintiffs primarily object to 28 C.F.R. § 75.2(a)(1), which requires that a producer keep: (1) a copy of the depiction; and (2) when the depiction is published on the Internet, a copy of any URL or other identifying reference associated with the depiction.

Plaintiffs first assert that the requirement that they keep a copy of each depiction is itself unduly burdensome, as it would require producers to incur substantial storage costs. They provide the affidavit from plaintiff Conners asserting that he will have to cease operation of his websites should the regulations not be enjoined. However, Defendant provides evidence from Plaintiffs' own witness that website operators generally keep a copy of each depiction they post on their website as a matter of course for business purposes. (Douglas Dep., at 112) (deponent "can't think of a reason you would ever delete an image"). Furthermore, Defendant demonstrates that large numbers of depictions can be electronically stored by purchasing hard drives at insubstantial prices.[12]

---

health of the industry.

[11]This also applies to plaintiff New Horizon's concern with the labeling requirements, which have been in place since 1992. *See* 57 Fed. Reg. at 150228; 28 C.F.R. § 75.6 (1992).

[12]For instance, the expert asserted that a large website, that offered 40,000 videos on its site, could comply by purchasing $600 worth of additional hard drives, and that websites that offer only still pictures could comply by purchasing one $120 hard drive. Schmidt Declaration, ¶¶ 10 and 11.

I also find Conners' somewhat conclusory assertions of hardship suspect in light of his demonstrated ignorance of computer technology, and refusal to seek guidance from his more computer-literate partners.  (Conners Dep. at 66, 108.)

The final prong of the intermediate scrutiny test is whether the statute and regulations leave open ample alternative channels for communication of the information.  *Am. Lib. Assoc.*, 33 F.3d at 88.  Defendants note that, giving the Plaintiffs the benefit of the doubt, they have identified only one magazine and perhaps ninety (out of 500,000) websites that will be forced to cease production based on the statute and regulations.  As a result, Plaintiffs have failed to demonstrate a substantial likelihood that the statute and regulations fail to "leav[e] the quantity and accessibility of speech substantially intact."  *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring).

Consequently, on the record before me, Plaintiffs have not met the preliminary injunction standard to show a substantial likelihood that the requirement to keep a copy of each depiction is overly burdensome–with two exceptions.

The first exception is the so-called live Internet chat rooms.  These involve a performer on the Internet who engages in printed or telephonic dialogue with a customer while a simultaneous video image of the performer is transmitted.  The performances usually involve actual sexually explicit conduct.  (Aff. of Jeffrey Douglas, ¶22).  A primary producer may operate scores of different rooms or channels for 24 hours on every day of the year.  *Id.* at ¶23.  Prior to the new regulation the plaintiff took the position that the chat rooms were not covered by § 2257 or the previous regulation.

19

*Id.* at ¶22.  Without deciding the particular issue, I assume that the chat room would fall within the definition of a "matter" covered by § 2257.  *See* 18 U.S.C. 2257(h)(3)("the term 'produces' means to produce . . . or publish any . . . computer-generated image, digital image, or picture, . . .").  The requirement that the producer keep a copy of the depiction was not present in the previous regulation and hence the apparent practice of not recording each chat room would not otherwise be violative of the regulation.  It is a reasonable reading of the new regulation, however, that it requires the producer of the "digitally-or computer-manipulated image, digital image, picture or other matter that contains a depiction of actual human being engaged in actual sexually explicit conduct" maintain a "copy of the depiction."  28 C.F.R. § 75.2(a)(1)(i).  Plaintiffs assert that to do so would involve extraordinary computer capacity of terabytes (1 trillion bytes) and petabytes (1 quadrillion bytes) on an annual basis which could cost as much as $15 million dollars annually.  *(*Aff. of Jeffrey Douglas at ¶ 23.  Defendant does not present any contravening testimony concerning chat rooms.

This evidence may present a substantial likelihood that the regulation is not narrowly tailored with regard to chat rooms since it may well burden substantially more speech than is necessary to further the government's legitimate interest.  *See Am. Lib. Assoc.*, 33 F.3d at 88 and *Connection Dis. Co.,* 154 F.3d at 293.  It is not disputed that the performer is often engaged in conduct or actions which are not sexually explicit.  Further, as the government has argued, it does not seek to ban any expression but rather combat child pornography.  Particularly with regard to the circumstance of the chat room, a narrow tailoring may well require no more than the identification of the

20

performer as otherwise prescribed without the necessity of maintaining a copy of the entire time of depiction.  Without deciding precisely how such a regulation may be constitutionally tailored at this juncture of the litigation, I simply conclude that plaintiffs have established a substantial likelihood of success on this particular issue.

Plaintiffs have also met their burden to the extent that producers are required to keep a copy of any URL (or other identifying reference) associated with a depiction published on the Internet, regardless of whether the producer has control over the website which posts the depiction.  At the hearing, defense counsel represented that producers were only responsible for recording those URLs from websites which they themselves controlled.

The regulation is not clear on this issue, and merely states that "[w]here the depiction is published on an Internet computer site or service, a copy of *any* URL associated with the depiction [is required] . . . ."  28 C.F.R. § 75.2(a)(1)(ii) (emphasis added).  But, even Defendant's expert witness testified that it would be impossible to comply with this requirement.  (Schmidt Dep., at 143.)  Therefore, I consider Defendant's representation at the hearing that the regulation does not require producers to maintain copies of depictions on websites outside of their control a concession that such a requirement would be invalid and that he may be enjoined from enforcing such a requirement.  Consequently, to the extent § 75.2(a)(1)(ii) requires a producer to maintain records of URLs or other indentifying information from websites outside of the producer's control, Plaintiffs have demonstrated a substantial likelihood that this is overly burdensome.

21

In summary, I find that Plaintiffs have not demonstrated a substantial likelihood of success in demonstrating that the amended portions of the statute and regulations create an undue burden, with the exception of § 75.2(a)(1)(I) applied to chat rooms and § 75.2(a)(1)(ii) applied beyond websites controlled by the producer.

C.  Privacy Rights

Plaintiffs also argue that the statute and regulations violate the privacy rights of (1) performers by requiring that primary producers provide secondary producers with a copy of the performer's identification card, which may have information such as residential addresses, etc; and (2) producers who work out of their homes by mandating disclosure of the actual place of business on a label.

The Supreme Court has found that certain privacy interests are protected by the Constitution.  *See Lawrence v. Texas*, 539 U.S. 558, 564 (2003) (state could not make private homosexual conduct a crime, as adults are entitled to engage in private conduct under the Fourteenth Amendment); *Stanley v. Georgia*, 394 U.S. 557, 567 (1969) (First and Fourteenth Amendment prohibit making mere private possession of obscene material a crime).[13]  *See also Buckley v. Am. Const. Law Fdn*, *Inc.*, 525 U.S. 182, 200 (1999) (requiring individuals circulating petitions to wear name badge violates First Amendment because it discouraged speech without sufficient cause).  Furthermore, under some circumstances the First Amendment provides a right to anonymous

---

[13]Plaintiffs cite *National Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) as supporting a constitutional privacy right to prevent disclosure of private information; however, the case relied on a statutory right under FOIA, not the Constitution.

speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995).

However, the cases which might arguably support Plaintiffs' position, *Buckley* and *McIntyre*, both addressed laws impacting political speech, which, despite Plaintiffs' counsel's protestations to the contrary, is viewed differently than pornography under First Amendment case law.  *See McIntyre*, 514 U.S. at 346 (political speech "occupies the core of the protection afforded by the First Amendment" and therefore laws regulating political speech are subject to exacting scrutiny); *Buckley*, 525 U.S. at 186-87 (*quoting Meyer v. Grant*, 486 U.S. 414, 425 (1988)) (petition circulation is "core political speech" for which First Amendment protection is "at is zenith").  Even in the context of political speech, invalidating disclosure requirements requires evidence of "a reasonable probability that the compelled disclosure of . . . names will subject them to threats, harassment or reprisals from either Government officials or private parties." *McConnell*, 124 S.Ct. at 692 (*quoting Buckley*, 424 U.S. at 74).  Plaintiffs provide evidence of only one instance of identity theft resulting from § 2257 records, and a vague assertion by a performer that she is aware "of a number of instances in the past two decades where adult performers have been stalked by fans."  (Hartman Decl., ¶ 9.) This is insufficient to establish a reasonable probability of harm resulting from the regulations.

Furthermore, neither of the requirements objected to by Plaintiffs are new; yet again, they fail to provide any indication that the quantity of explicit speech has diminished due to these requirements.  *Cf. Buckley*, 525 U.S. at 198 (describing evidence that name badge requirement for petition bearers discouraged individuals

from participating in petition drives).

Finally, with regard to the performers' privacy concerns, they appear to relate entirely to the disclosure of their identification cards to secondary producers.  However, I have already ruled that the statute and regulations should not be applied to some secondary producers under *Sundance.*  Furthermore, Defendant notes that there is no reason why the address on ID cards could not be redacted to protect the performers' confidential information, including address, actual day of birth, social security number, etc.  Under these circumstances, Plaintiffs' have not demonstrated a substantial likelihood of success with regards to their claim that the statute and regulations infringe upon protected privacy rights.

2.      Irreparable Harm

Plaintiffs argue that deprivation of First Amendment rights, if but for a moment, constitutes irreparable harm.  *See Elrod v. Burns*, 427 U.S 347, 343 (1969) (the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury).  *See also Connection Distrib. Co.*, 154 F.3d at 288 ("to the extent [plaintiff] can establish a substantial likelihood of success on the merits of its First Amendment claims, it has also established the possibility of irreparable harm as a result of the deprivation of claimed free speech rights).  Plaintiffs have so established with regard to application of § 75.2 to chat rooms and websites not controlled by the producer.  Otherwise, plaintiffs have not established a liklihood of success on their First Amendment claim.

As to the *ultra vires* argument, there is an independent showing of irreparable

24

harm.  It is clear that requiring producers who cannot be regulated under *Sundance* to comply with the statute and regulations would require them to either risk criminal prosecution or incur a variety of significant obligations and costs.  Although not emphasized by Plaintiffs, they provide evidence that such compliance costs constitute irreparable harm.  For instance, plaintiff New Horizons, a wholesale distributor of adult entertainment materials, provides evidence that compliance with the regulations and statute will result in the loss of tens of thousands of dollars based on the impact on its advertising.  (Friedlander Decl., ¶ 29.)  Secondary producers will incur additional, if unquantified, costs in storing, organizing and maintaining the required records, and primary producers such as Conners will face costs in complying with secondary producer requests for the required records.  (Conners Decl., ¶¶ 16-17.)

Additionally, FSC members who would constitute secondary producers relied on the *Sundance* decision and did not obtain the required records from primary producers, and therefore will be required to remove from their publications a great quantity of depictions.  (Douglas Aff., ¶¶ 31-33.)  Defendant argues that a movant may not rely on irreparable harm that is self inflicted to support a motion for a preliminary injunction, and thus, to the extent they placed themselves in harm's way by unreasonably relying on *Sundance*, they may not show irreparable harm.  I disagree that Plaintiffs acted unreasonably by relying on the decision of the one court of appeals that has directly addressed the issue.

There is no indication that, should Plaintiffs ultimately obtain a ruling in their favor, they could obtain any legal relief or other compensation for the costs they incur

25

based on the invalid application of the statute and regulations.   Under these circumstances, I find that Plaintiffs face irreparable harm absent an injunction preventing Defendant from enforcing the statute and regulations against secondary producers who do not have direct contact with the performers.

3.      Balance of Injuries

Defendant argues that an injunction will greatly increase the likelihood of the distribution of child pornography during the period of the injunction.  However, as Plaintiffs point out, the force of this assertion is somewhat diminished by the Department of Justice's failure to actively utilize the statute.  More importantly, this injunction would prevent enforcement of the statute and regulations only against Plaintiffs, and then, only to the limited extent indicated.

I do not accept Plaintiffs' argument that Defendant will suffer no harm due to imposition of an injunction.  Nonetheless, given its limited scope, I conclude that, on balance, Plaintiffs face the greater injury.

4.      Public Interest

Clearly there is a great public interest in preventing child pornography. However,  Defendant must act within the scope of the his lawful authority in doing so, and Plaintiffs argue convincingly that his application of the regulations to all "secondary producers" is outside that authority.  *See Sundance*, 139 F.3d at 810 ("neither the court nor the Attorney General has the authority to rewrite a poor piece of legislation").  Nor is it in the public interest to acquiesce in Defendant's disregard for the only appellate decision precisely on point, and which is binding law in this Circuit.  Under these

26

circumstances, I find that a properly constrained preliminary injunction would not adversely affect the public interest.

5.    Bond

I accordingly conclude that Plaintiffs have met their burden to obtain a preliminary injunction to a limited extent.  However, Fed. R. Civ. P. 65(c) prescribes that a preliminary injunction should be conditioned upon security for payment of such costs and damages as may be suffered by the wrongfully enjoined party.  The parties do not inform me concerning bond issues other than Plaintiffs assertion that no bond should be required.  I do have the discretion not to require security after giving consideration to the circumstances of the case that may "justify the unusual practice of leaving the enjoined party bereft of security."  *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).  There may well be arguments for dispensing with security, but at this point I conclude that the defendant will at least be entitled to his costs in the event is it ultimately determined that he was wrongfully enjoined.  Accordingly, I will condition the injunction upon the security of a $10,000 bond without prejudice to either party arguing that the bond should be increased or decreased.

Accordingly, it is ordered:

1.    Plaintiff's motion for a temporary restraining order, filed June 16, 2005 (Docket # 2), subsequently converted to a motion for preliminary injunction at the hearing held June 23, 2005, is granted in part.

2.    Defendant is enjoined, pending the outcome of these proceedings or further order, from treating any of the Plaintiffs or members of plaintiff

27

Free Speech Coalition as "producers" under 28 C.F.R. part 75 or persons or entities "produc[ing]" any book, magazine, periodical, film, videotape, or other matter containing one or more visual depictions of actual sexually explicit conduct under 18 U.S.C. § 2257, to the extent that plaintiff or member of plaintiff Free Speech Coalition's activity does not involve the hiring, contracting for, managing, or otherwise arranging for the participation of the depicted performer.

3. Defendant is enjoined, pending the outcome of these proceedings or further order, from enforcing 28 C.F.R. § 75.2(a)(1)(i) against any of the plaintiffs or members of FSC in their operation of an Internet chat room.

4. Defendant is enjoined, pending the outcome of these proceedings or further order from the court, from enforcing 28 C.F.R. § 75.2(a)(1)(ii) against any of the Plaintiffs or members of FSC with regards to a website that is not controlled by that plaintiff or member of the Free Speech Coalition.

5. The preliminary injunction is conditioned upon Plaintiffs providing a $10,000 bond.

6. Either party may show cause on or before January 9, 2006, why the security should be increased or decreased.

7. This injunction is binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this

28

order by personal service or otherwise.

8.      Otherwise, Plaintiffs' motion is denied.

9.      Plaintiffs' motion to appoint special master (docket no. 17) is denied as

moot.

DATED at Denver, Colorado, on December 28, 2005.

BY THE COURT:


/s/ Walker D. Miller
United States District Judge